**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin BEIN, Thomas DeAngelis, Albert Vitti, and Arthur Billups, Defendants-Appellants.**

**Nos. 357, 360, Dockets 83–1141 to 83–1144.**

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1983.

Decided Feb. 13, 1984.

Thomas F. Liotti, Carle Place, N.Y., for defendant-appellant Calvin Bein.

Jeremy G. Epstein, New York City, for defendant-appellant Thomas DeAngelis.

Barry M. Fallick, New York City, for defendant-appellant Albert Vitti.

Henriette D. Hoffman, New York City, for defendant-appellant Arthur Billups.

Victoria J. Meyers, Sp. Asst. U.S. Atty., N.D. Ill., Chicago, Ill. (Daniel W. Gillogly, Asst. U.S. Atty., Chicago, Ill., on brief), for plaintiff-appellee.

Before OAKES, KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Appellants Calvin Bein, Thomas DeAngelis, Albert Vitti and Arthur Billups were convicted on various counts for wire fraud, mail fraud and conspiracy in violation of 18 U.S.C. §§ 1341, 1343 and 2 for their participation in a scheme to sell illegal commodity option contracts. Bein was also convicted of selling commodity options in violation of the Commodity Exchange Act as amended, 7 U.S.C. §§ 6c(c) and 13b (1976).[1] We affirm.

## BACKGROUND

The convictions before us involve the activities of E–K Capital Corporation ("EKCC"), which was in the business of selling investments in gold and silver. Bein was President of EKCC, DeAngelis was Treasurer, and Robert Enchelmeyer, who testified for the government, was sole shareholder and Secretary. Bein and DeAngelis were responsible for sales and marketing while Enchelmeyer handled certain administrative functions and purchasing. The corporation's checks, which required the signatures of two of the three officers, were usually signed by Bein and either DeAngelis or Enchelmeyer. EKCC's business consisted of the sale of "deferred delivery" gold and silver contracts. From an unpartitioned salesroom with desks and telephones, sales personnel hired and trained by Bein and DeAngelis made usually unsolicited phone calls to potential buyers throughout the country. For a nonrefundable transaction fee (known as a "contango" fee) ranging from $1,000 up, the purchaser of an EKCC contract obtained the right to "control" a specified amount of gold or silver for a limited time at a fixed "strike" price set by the market price of the commodity at the time the contract was pur-

---

1. The indictment contained twenty-one counts. Bein was convicted on eighteen fraud or conspiracy counts and two counts of selling illegal commodity options. DeAngelis was convicted on eighteen fraud or conspiracy counts but the jury failed to reach a verdict on two counts of selling illegal commodity options. Vitti and Billups were found guilty on one fraud count, the jury failing to reach a verdict on the remaining counts against them.

chased. If the price of gold or silver exceeded the strike price at the expiration of the contract, the purchaser could either buy the metal at the strike price or receive the profit in cash from EKCC. If the market price was below the strike price at the date of maturity, the purchaser was not required to execute the contract. In either event, the contango fee was unrecoverable by the purchaser. EKCC represented to customers in brochures and in telephone communications that all contracts would be backed by the company's inventory of precious metals or by commodity futures contracts. Purchasers were told that their only risk was loss of the nonrefundable contango fee.

Trade was brisk, and EKCC received $2.7 million from investors purchasing such contracts. However, EKCC did not cover most of the contracts. By February, 1980 the company owed $11 million in profits to its customers whose contracts had matured during a rising market. Bein and DeAngelis planned to defer payments until a hoped for decline in the market by convincing contract holders to roll over profits into new contracts.

Arthur Billups was hired as a salesman in October, 1979, but after January, 1980 his principal duties were to persuade customers to roll over their profits into new contracts. In tape-recorded conversations with customers, Billups made misrepresentations as to his position within EKCC, the extent of his clientele and the nature of the rolled-over investments.

Albert Vitti, a sales manager, had regular contacts with EKCC customers, in which he misrepresented himself as a buyer and as the "head trader." He sometimes used the alias "John Aren," and he sought to persuade clients to roll over their profits into new contracts by giving them false information about EKCC's inventory.

In January, 1980, when Enchelmeyer discovered that $220,000 had been transferred out of EKCC by Bein and DeAngelis, he demanded an audit of EKCC's books which Bein and DeAngelis refused. Enchelmeyer then transferred $134,000 of EKCC's funds to a checking account over which he had exclusive control. Enchelmeyer told Bein and DeAngelis that he would not return the funds until they agreed to an audit. Bein stated that EKCC could not withstand an audit and that Enchelmeyer, as sole shareholder, would be left holding the bag and would go to jail. Enchelmeyer responded that he would not go by himself, whereupon DeAngelis attacked and repeatedly punched him, choked him with his necktie and threw a liquor bottle at him, cracking his ribs. Shortly thereafter Enchelmeyer resigned from EKCC. EKCC ceased doing business when its offices were raided on March 20, 1980 by the FBI.

During the grand jury proceedings, Fred Stitt, an accountant, testified about meetings he attended where Bein, DeAngelis and two attorneys discussed the type of business EKCC wanted to do. At those meetings, the attorneys called attention to *Commodity Futures Trading Commission v. United States Metals Depository*, 468 F.Supp. 1149 (S.D.N.Y.1979), a decision holding that certain "deferred delivery" gold and silver contracts were illegal option contracts. After the meeting, Stitt read the case and, in a discussion with Bein outside the presence of the attorneys, recommended that EKCC not sell option contracts.

At trial, the conversations between Bein and DeAngelis and the attorneys were excluded on attorney-client privilege grounds. Stitt's conversation with Bein, however, was admitted against both Bein and DeAngelis. Also, at trial, the government called an expert witness who gave testimony defining and distinguishing between deferred delivery or futures contracts and commodity option contracts. Bein's counsel informed the district court that he too intended to call an expert, Ira Cobleigh, to support defendants' contention that they were selling legal deferred delivery contracts. In early February, Chief Judge Motley informed counsel that she intended to hold court on February 21, President's Day, if necessary. However, Cobleigh, who was not under subpoena, refused to appear that day because it was a holiday. Since he

was the only defense witness and the government had rested its case, defendants requested a stay until February 22. Chief Judge Motley denied the request, calling Cobleigh's refusal to appear "arbitrary" and indicating that she would instruct the jurors on the distinction between deferred delivery contracts and commodity options, as other courts had previously formulated the distinction.

## DISCUSSION

■ On appeal, appellants raise many claims, five of which merit discussion.[2]

### 1. The Contracts Sold by Bein

Bein contests his conviction on two counts of selling illegal option contracts,[3] maintaining that what he sold were legal deferred delivery or futures contracts.

**2.** Vitti's challenge to the sufficiency of the evidence is meritless. His supervisory authority, customer contacts and presence in the unpartitioned salesroom from October, 1979 through March 20, 1980, at the very height of EKCC's fraudulent activity, thoroughly undermine his contention that he was unaware of the deceptive and fraudulent sales occurring around him. Moreover, Vitti himself made misrepresentations to a customer to induce the customer to roll over contract profits. Appellant Billups' challenges to the prosecutor's rebuttal summation and the court's charge are similarly without merit.

**3.** 7 U.S.C. § 6c(c) reads in relevant part:
[N]o person may, after September 30, 1978, offer to enter into, enter into, or confirm the execution of any commodity option transaction involving any commodity regulated under this chapter but not specifically set forth in section 2 of this title prior to October 23, 1974, until (1) the Commission transmits to the House Committee on Agriculture and the Senate Committee on Agriculture, Nutrition, and Forestry documentation of its ability to regulate successfully such transactions, including a copy of the Commission's proposed rules and regulations, and (2) the expiration of thirty calendar days of continuous session of Congress after the date of such transmittal .... *Provided,* That this prohibition shall not apply to any transaction expressly permitted under rules or regulations prescribed by the Commission, before or after September 30, 1978, to be offered to be entered into, entered into, or confirmed, in which the purchaser is a producer, processor, commercial

In commodity futures markets, a deferred delivery or futures contract involves the sale or purchase of specified amounts of a commodity to be delivered in the future. The purchaser of a futures contract makes a down payment and is obligated to take delivery when the contract matures. By contrast, an option contract entitles a purchaser to buy or sell a commodity by some specified date at a fixed price, known as the "strike" price, *British American Commodity Options v. Bagley,* 552 F.2d 482, 484–85 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977), determined by the market value of the commodity at the time the option is purchased. The grantor of an option is obligated to deliver if the purchaser exercises the option, but the purchaser has no obligation to exercise.

user of, or a merchant handling, the commodity involved in the transaction, or the products or byproducts thereof.

7 U.S.C. § 13b reads in pertinent part:
If any person ... is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market, or otherwise is violating or has violated any of the provisions of this chapter or of the rules, regulations, or orders of the Commission thereunder, the Commission may, upon notice and hearing, and subject to appeal as in other cases provided for in section 9 of this title, make and enter an order directing that such person shall cease and desist therefrom and, if such person thereafter and after the lapse of the period allowed for appeal of such order or after the affirmance of such order, shall fail or refuse to obey or comply with such order, such person shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $100,000, or imprisoned for not less than six months nor more than one year, or both, except that if such failure or refusal to obey or comply with such order involves any offense within paragraph (a) or (b) of section 13 of this title, such person shall be guilty of a felony and, upon conviction thereof, shall be subject to the penalties of said paragraph (a) or (b): *Provided,* That any such cease and desist order against any respondent in any case of manipulation of, or attempt to manipulate, the price of any commodity shall be issued only in conjunction with an order issued against such respondent under section 9 of this title.

Because options can be sold by anyone willing to risk being able to cover obligations when and if purchasers decide to exercise their options, options markets may be entered by sellers having very little capital and willing to take such risks. Fearing such abuses, Congress has regulated the commodity futures markets in varying degrees since 1922. *See* S.Rep. No. 850, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 2087, 2097, 2099, 2100, 2102–03, 2112. Specifically, Congress amended the Commodity Exchange Act in 1978, 7 U.S.C. §§ 1 *et seq.* ("Act") to prohibit all trade in commodity options except by certain exempted persons specified by the Commodity Futures Trading Commission ("CFTC"). *Id.* at 2121–22. Deferred delivery or futures contracts, however, remain legal although subject to regulation by the CFTC.

In *Commodity Futures Trading Commission v. United States Metals Depository,* 468 F.Supp. 1149 (S.D.N.Y.1979), Judge Weinfeld set forth the distinguishing features of option contracts in a discussion which we adopt:

> Functionally, options are distinguishable from futures contracts and margin sales in at least three significant respects: (1) the initial charge for an option, sometimes called a "contango fee," is a nonrefundable premium covering the seller's commission and costs, in contrast to the "down payment" paid in a futures contract or a margin sale, which is applied against the ultimate sale price; (2) the option contract gives the purchaser the right to take physical possession of the commodity but does not obligate him to do so, as a futures or margin contract would; (3) a profit in an option contract accrues only if the price of the commodity rises enough to cover the contango fee (but losses are limited to the contango fee), while the futures or margin buyer profits if the sale price of his right to future delivery exceeds the purchase price (and suffers a loss if the former price is less than the latter price).

468 F.Supp. at 1155.

■ Viewing the evidence in the light most favorable to the government, *Glasser*

*v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), there can be little doubt that the so-called "deferred delivery" contracts sold by Bein were in reality commodity options. First, purchasers paid a one-time, nonrefundable, transaction fee which merely covered sales commissions and costs and secured the right to purchase later at the strike price. Purchasers thus did not invest in the underlying commodity. Second, Bein's contracts did not obligate the purchaser to take delivery of the commodity on the specified date. Third, the purchaser could liquidate the contract and take the profits in cash if the market price had risen, or abandon it and absorb the contango fee as the only loss if the market price had declined. The jury could thus easily infer that Bein violated the prohibitions against the sale of commodity options.

### 2. *The Stitt-Bein Conversation*

■ Chief Judge Motley properly admitted the conversation between Stitt and Bein which took place outside the presence of the attorneys and concerned the propriety of EKCC's sales of option contracts. Since there is no accountant-client privilege in this circuit, *In re John Doe Corporation,* 675 F.2d 482 (2d Cir.1982), the traditional requirements of the attorney-client privilege apply. That privilege attaches

> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived . . .

*United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961); *accord In re Horowitz,* 482 F.2d 72, 80–81 n. 7 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).

■ The Stitt-Bein conversation fails to meet this test. It occurred after meetings with counsel and after legal advice had

already been obtained. Stitt was functioning as Bein's accountant, not his professional legal advisor, and his statements to Bein about the propriety of selling option contracts, whether or not they were based on Stitt's view of the law, are not covered by the privilege. While Stitt's presence at Bein's meetings with counsel may have facilitated the latter's understanding of technical legal advice, performance of that function does not cloak Stitt with the expertise, ethical obligations or professional rights of one admitted to the bar. *See In re Horowitz, supra.* While Stitt was prevented from testifying at trial about the communications he heard or participated in at meetings with counsel, he was properly allowed to testify about the later conversation with Bein regarding EKCC's business. Only communications between a client and attorney are protected by the privilege, not discussions with non-lawyers concerning the same subject matter.

DeAngelis nonetheless claims that admission of the conversation against him was error since he was not present when it took place. The error, if any, was harmless. Although DeAngelis was convicted on the fraud counts and on the conspiracy count related to fraud, the jury failed to convict him on the counts involving the Commodity Exchange Act. Stitt's advice to Bein not to sell option contracts was relevant only to those latter counts and not to the fraud or conspiracy counts. The advice had nothing to do with covering option contracts with inventory or futures contracts, with making accurate statements to customers or with eschewing high pressure tactics to induce purchasers to roll over profit. It simply was a statement that EKCC should not sell option contracts however honest the methods used or however protected the customer might be. Therefore, admission of the evidence did not prejudice DeAngelis on the counts of which he was convicted.

### 3. The Indictment

Appellants also claim that the indictment must be dismissed because the prosecutor improperly presented to the grand jury evidence protected by the attorney-client privilege, namely Stitt's account of the meetings between Bein and DeAngelis and their lawyers. As noted above, Chief Judge Motley excluded this evidence at trial on attorney-client privilege grounds. Appellants claim, however, that the indictment was tainted by Stitt's testimony. We again disagree.

An indictment may be dismissed in order to eliminate prejudice to a defendant or to prevent prosecutorial impairment of the grand jury's function. *See United States v. Hogan,* 712 F.2d 757 (2d Cir.1983). Presentation to a grand jury of hearsay or other evidence inadmissible at trial is not *per se* prohibited, however, at least so long as the reliance upon it is not so extensive as to mislead the grand jury as to the strength of the evidence. *See United States v. Estepa,* 471 F.2d 1132, 1137 (2d Cir.1972) (failure to warn of dangers of extensive hearsay). The danger in the use of privileged material is not that a tribunal will be misled or a party's litigation position unfairly prejudiced, since the reliability of the evidence is not in question. The fear is rather that valued relationships may be disrupted by an apprehension that confidential communications may be disclosed. Given the fact that grand jury proceedings are normally secret, that an authoritative adjudication as to whether material is privileged may have to await subsequent proceedings and that dismissal of an indictment is a most serious step, courts have declined to dismiss indictments because of the use of privileged matter before the grand jury, *United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), including testimony by attorneys as to privileged communications, the precise issue before us. *United States v. Colasurdo,* 453 F.2d 585, 595–96 (2d Cir.1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). Such testimony of course is not permitted at trial.

### 4. Denial of the Defense Request for a Stay

Bein and DeAngelis also challenge Chief Judge Motley's denial of the defense's re-

quest for a one-day stay to accommodate Cobleigh, thereby compelling appellants to rest their case without his testimony.

■■■■ The trial judge has broad discretion over the trial timetable. To show abuse of that discretion, appellants must demonstrate arbitrary action substantially impairing the defense. *United States v. Ellenbogen,* 365 F.2d 982, 985 (2d Cir.1966), *cert. denied,* 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967); *accord, United States v. Cicale,* 691 F.2d 95, 106 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). Appellants have failed to meet this burden.

■■■ Counsel for appellants knew almost two weeks in advance that the court intended to sit on President's Day, February 21, and thus were aware of the possibility that they might have to present their case on that holiday. During that period, they might have secured Cobleigh's presence by subpoena or arranged to call another expert. Instead they ran the risk, now realized, that they would have to rest without his testimony. Moreover, a continuance until Tuesday, February 22 would have required rescheduling of the calendar for that day, thereby causing inconvenience to other litigants, a factor Chief Judge Motley was free to weigh in her consideration of the request for a stay. She was also free to take into account the fact that Cobleigh offered none of the usual reasons for a

refusal to appear, such as illness, business commitments, religious beliefs, or even prior non-work related commitments, any of which might have been acceptable excuses. We thus see no arbitrariness in Chief Judge Motley's actions.

Nor was the defense impaired by the court's refusal of a continuance. The earmarks of legal and illegal commodity contracts were fully described by Chief Judge Motley in her charge to the jury,[4] to which appellants did not object. Given the other evidence in this case, we are at a loss to understand what testimony Cobleigh might have given which would have been admissible within the framework of that charge and which would have aided appellants.

### 5. *The Enchelmeyer-DeAngelis Altercation*

■■■ DeAngelis claims that introduction of evidence of his altercation with Enchelmeyer was error. We disagree. Evidence demonstrating a defendant's consciousness of guilt is admissible under Fed. R.Evid. 404(b) if the court determines that the evidence is more probative than prejudicial under Fed.R.Evid. 403. *United States v. Williams,* 596 F.2d 44, 50 (2d Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979). Evidence of threats by a defendant against a potential witness against him can, if this balancing test is

---

4. The subject portion of the court's charge reads as follows:

A commodity option is a contractual right to buy or sell a commodity or commodity future by some specific date at a specified, fixed price.

A commodity option contract is to be distinguished from a commodity futures contract. A commodity futures contract is a contractual undertaking, which can be transferred to third parties, to buy or sell a fixed amount of a certain commodity on some specified date.

Courts have detailed the distinction between options contracts and futures contracts as follows:

1, the initial charge for an option, sometimes called a "contango fee," is a nonrefundable premium covering the seller's commission and costs, in contrast to the "down payment" paid in a futures contract or a margin

sale, which is applied against the ultimate sale price;

2, the option contract gives the purchaser the right to take physical possession of the commodity but does not obligate him to do so, as a futures or margin contract would;

3, a profit in an option contract accrues only if the price of the commodity rises enough to cover the contango fee, but losses are limited to the contango fee, while the futures or margin buyer profits if the sale price of his right to future delivery exceeds the purchase price, and suffered a loss if the former price is less than the latter price.

The issue for you, the jury, to decide is whether, regardless of the label applied to the contracts sold by E.K. Capital Corporation, those contracts were, in fact, commodity option contracts, and, if so, whether defendants knew that what they were selling were such options.

met, be used to show guilty knowledge. *See, e.g., United States v. Cirillo,* 468 F.2d 1233, 1240 (2d Cir.1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973). Chief Judge Motley's ruling is far from clearly erroneous. Since the altercation began when Enchelmeyer announced that he would not go to jail alone, DeAngelis' claim that he could not have regarded Enchelmeyer as a potential witness against him at that time rings hollow.

For the reasons set forth above, the convictions are affirmed.