Fred **ACKERMAN**, et al., Plaintiffs,

v.

**NATIONAL PROPERTY ANALYSTS, INC.**, et al., Defendants.

Steven S. **REMINGTON**, M.D., et al., Plaintiffs,

v.

Alan **TALANSKY**, et al., Defendants.

Nos. 92 Civ. 0022 (LJF), 92 Civ. 1298 (LJF).

United States District Court, S.D. New York.

July 1, 1993.

John Triggs, Jacobson & Triggs, New York City, for plaintiffs in No. 92–CV–0022–LJF.

Daniel P. Levitt, New York City, for Alan Talansky, First Atlantic Inv. Corp. and AST Properties, Inc.

Thomas B. Kinzler, Kelley Drye & Warren, New York City, for Travelers Indem. Co.

Daniel P. Levitt, New York City, for United Growth Properties, L.P., United Properties of America, L.P.

Charles L. Chrein, New York City, pro se.

William J. Burke, Burke & Stone, New York City, for Melvin Spitz.

Robert Carlson, Reid & Priest, New York City, for Spengler Carlson Gubar Brodsky & Fischling.

Kenneth J. Warren, Manko Gold & Katcher, Bala Cynwyd, PA, for Admiral Ins. Co.

David A. Boyar, New York City, for Hutton Nelson & McDonald.

David W. Rivkin, Debevoise & Plimpton, New York City, for Price Waterhouse & Co.

Geoffrey W. Heineman, Ohrenstein & Brown, New York City, Wharton Econometric Forecasting Associates, Inc.

John N. Romans, Katten Muchin & Zavis, New York City, for Greyhound Financial Corp.

James Kaplan, Wilson Elser Moskowitz Edelman & Dicker, New York City, for Weiner Zuckerbrot Weiss & Brecher.

Richard O'Leary, McCarter & English, New York City, for Lincoln Nat. Corp. and Lincoln Nat. Life Ins. Co., Sec. Life Ins. Co., First Penn Pacific Life Ins. Co., American States Life Ins. Co.

Janis Meyer, White & Case, New York City, for Credit Lyonnais.

William J. Burke, Burke & Stone, New York City, for Melvin Spitz.

Solomon J. Jaskiel, Beigel & Sandler, New York City, for plaintiffs in No. 92–CV–1292–LJF.

George W. Croner, Kohn, Savett, Klein & Graf, Philadelphia, PA, Lori A. Sullivan, Sul-

livan & Damen, White Plains, NY, for National Property Analysts, Inc., United Properties of America, L.P., Edward B. Lipkin, Howard N. Brownstein.

Daniel P. Levitt, New York City, for National Community Centers III, National Community Centers IV, National Community Centers VII, National Community Centers VIII, National Community Centers IX, National Community Centers X, National Community Centers XI–A, National Community Centers XIV, National Community Centers XV and National Community Centers XVI.

Tracy Elise Poole, Wood, Williams, Rafalsky & Harris, New York City, for Resolution Trust Corp.

## OPINION & ORDER

FREEH, District Judge.

In these related fraud actions, defendants Alan Talansky ("Talansky"), United Growth Properties ("United Growth"), First Atlantic Investment Corp., United Properties of America, AST Properties (collectively, the "United Growth Defendants"), National Property Analysts, Inc., Edward Lipkin, and Howard Brownstein, (collectively the "NPA Defendants"), Price Waterhouse, The Travelers Indemnity Company ("Travelers"), Weiner Zuckerbrot & Weiss ("Weiner Zuckerbrot"), and Spengler Carlson Gubar Brodsky & Frischling ("Spengler Carlson") move to disqualify plaintiffs' counsel and to dismiss plaintiffs' complaints, as well as other ancillary relief.

The motions are based upon plaintiffs' improper use of information obtained from Leonard Hirschhorn, Esq. ("Hirschhorn"), former in-house counsel to the NPA and United Growth Defendants, in drafting the two complaints against the defendants. Plaintiffs oppose both motions. For the reasons stated below, plaintiffs' counsel are disqualified from any further participation in this litigation, and both actions are dismissed without prejudice.

*Background*

Familiarity with the facts stated in the Court's September 9, 1992 Opinion and Order are assumed and will not be repeated here except where necessary to an understanding of the issues presently before the Court. Plaintiffs in this consolidated action are all investors in one or more of twelve National Community Center Partnerships (the "NCCs") created by defendants in 1985 and 1986. According to the two complaints, defendants defrauded plaintiffs into investing in the initial NCCs and then further defrauded plaintiffs in 1989 when they combined the NCCs into one partnership known as United Growth.

In the September Opinion, the Court dismissed plaintiffs' federal securities and civil RICO claims, as well as some of plaintiffs' state law claims (the "September Opinion").[1] The issue now before the Court is whether the remaining claims should also be dismissed and plaintiffs' counsel disqualified based on the alleged violation of the Code of Professional Responsibility (the "Code").

It is undisputed that plaintiffs have based a substantial number of their allegations against defendants on information provided by an "insider" to the NCC partnerships. For example, prior to its September Opinion, the Court held oral argument on the various motions to dismiss. The primary issue at that time was the sufficiency of the two complaints under Fed.R.Civ.P. 12(b)(6) and 9(b). In an effort to persuade the Court of the sufficiency of the *Ackerman* complaint, counsel for the *Ackerman* plaintiffs, John Triggs, ("Triggs") of the law firm Jacobson & Triggs, stated:

We have information. We are talking to people who were there at the time. We were talking to them since last summer when this ad hoc committee asked us to take a look at this case. These people told us in detail things that you never have in a case like this. Generally, the kind of firms that specialize in this area don't have peo-

---

1. The Court elected to retain jurisdiction over the pendent state law claims pursuant to its supple- mental jurisdiction. 28 U.S.C. § 1367(a).

ple talking to them six months before you file this complaint. . . .

(Tr. at 47–48).

In addition, shortly after the Court issued its September Opinion, Solomon Jaskiel ("Jaskiel") of the law firm of Beigel & Sandler, counsel for the *Remington* plaintiffs, wrote a letter to the Court requesting permission to amend the *Remington* complaint a second time.[2] In support of that request, Jaskiel stated that "plaintiffs only learned of the fraud from an insider who provided information which could not have been obtained from any other source." (Jaskiel Ltr. at 2).

On or about September 25, 1992, Triggs informed defendants that Hirschhorn was the "insider" from whom plaintiffs were receiving information. Counsel for defendants immediately notified the Court of their concern that the communications with Hirschhorn constituted a breach of the Code and requested an evidentiary hearing on the matter.[3] The Court granted that request.

On November 4, 1992, Hirschhorn, an attorney a member of the New York Bar since 1976, testified before the Court concerning the information he provided to Triggs and a group of individuals who had invested in the partnerships and were exploring the possibility of litigation (the "ad hoc committee"). Although Triggs and Jaskiel both attended the hearing and had an opportunity to testify, they declined to do so. (Tr. at 145).

According to Hirschhorn, he first began working for NPA as in-house counsel in January 1982. (Tr. at 40–41). His primary

responsibility at NPA was to draft private placement memoranda, work he had learned to do while employed for three years as an attorney for the law firm of defendant Weiner Zuckerbrot. (Tr. at 42–44, 53, 107). In fact, Hirschhorn drafted the PPMs for all of the NCC partnerships at issue in this case, and distributed drafts of those PPMs to the outside professionals such as Price Waterhouse and Travelers for review.[4] (Tr. at 56–58, 71).

While Hirschhorn insists that he was not just an attorney for NPA, he never advised the defendant professionals, that he was not acting as anything but NPA's in-house counsel. Moreover, Hirschhorn initially reported to the General Counsel of the legal department, had an attorney who reported to him, identified himself in correspondence as NPA's counsel and represented himself as an attorney to the IRS. (Tr. 120–21, 7–17, 50–51, 72).

In November 1986, the United Growth Defendants hired Hirschhorn as their in-house counsel. (Tr. at 10–11, 37). As such, Hirschhorn participated in writing and preparing the PPM for United Growth, the roll-up partnership. (Tr. at 81–82).

Hirschhorn resigned as in-house counsel for the United Growth Defendants in May 1991. Nevertheless, he continued to provide legal services to them as outside counsel through July 1992, two months after the filing of the amended complaints in this case. (Tr. at 10–12).

---

**2.** Triggs filed the original *Ackerman* complaint on December 19, 1991, and Jaskiel filed the original *Remington* complaint on or about January 31, 1992. Following a pre-motion conference addressing the sufficiency of the pleadings, the Court stayed defendants' request to file motions to dismiss and directed plaintiffs to file amended complaints and RICO statements. On or about May 30, 1992, the *Ackerman* and *Remington* plaintiffs filed amended complaints. Defendants then filed their initial motions to dismiss.

**3.** Despite some suggestions in their opposition papers, plaintiffs have failed to demonstrate that by waiting to file these motions until discovery had commenced, defendants waived their rights to seek disqualification. Although under certain circumstances, delay in filing a motion to dis-

qualify will preclude the requested relief, plaintiffs have failed to show that the delay here was either unreasonable or a cause of prejudice. Moreover, the facts relating to this disqualification motion were not ascertained by counsel until nine months after the filing of the initial complaint.

**4.** While Hirschhorn testified that he was not acting in his capacity as a lawyer when he drafted the PPM's, the Court finds that testimony not credible based upon Hirschhorn's training and experience as a lawyer familiar with federal and state securities law. (Tr. at 43–45). Moreover, when asked at the hearing whether he had been hired by NPA as a lawyer, Hirschhorn responded unpersuasively that he did not believe he was hired as a lawyer. (Tr. at 53).

In the summer of 1991, the "ad hoc committee" was formed to explore the possibility of litigation against certain individuals and entities associated with the NCC partnerships. (Tr. at 15). The ad hoc committee consulted Hirschhorn, who was also an investor in the one of the NCC partnerships, about their potential claims. In his "consultant" role, Hirschhorn reviewed the retainer letter submitted by Jacobson & Triggs and participated in conference calls concerning "how the deals were structured, and an overview of the facts and participants involved in the deals." (Triggs Ltr. at 1). In 1991 alone, Hirschhorn billed the ad hoc committee more than $7,000 for his time. (Tr. at 19–20, 70–71).

On November 15, 1991, Triggs went to Hirschhorn's Westchester office to discuss the NCC and United Growth partnership offerings with Hirschhorn in person. Triggs knew that Hirschhorn had been in-house counsel to NPA and at their meeting Hirschhorn reminded Triggs that he could not discuss any privileged information regarding his former client and employer, NPA. However, neither man mentioned the need to avoid discussion concerning the NPA or United Growth Defendants' "secrets". (Tr. at 24–25, 129).

Although Hirschhorn was still billing United Growth for legal services, he never informed them of the meeting with Triggs nor asked for their consent.[5] (Tr. at 26). Not willing to have his time uncompensated, however, Hirschhorn billed the ad hoc committee for the time he spent with Triggs discussing the creation of the NCCs. (Tr. at 70–71).

During the November 15th meeting, which lasted approximately three hours, Triggs and Hirschhorn discussed potential legal claims arising out of the NCC partnerships. Specif-

ically, the two men discussed eight different topics relating to the NCC partnership offerings: (1) the creation and method of operation of the HUB license and its impact on potential investors; (2) the inquiries (if any) by the third-party professionals, lenders or sureties as to how the money generated from the HUB license was being spent; (3) Travelers' role in the deal, specifically whether Travelers had made any special arrangements in connection with any of the NCC partnerships; (4) Admiral Insurance Company's role in the NCC partnerships; (5) the reason, if any, why the NCC XVI partnership went forward without a surety; (6) communications with investors concerning their votes in the roll-up; (7) communications with lenders concerning their consents to the roll-up; and (8) communications with third parties concerning the possible refinancing of some of the more attractive properties. (Tr. at 26, 74–75; Triggs Ltr. at 3). Both the *Ackerman* and *Remington* amended complaints contain specific factual allegations relating to each of these eight topics.

In addition to discussing the partnerships with Triggs, Hirschhorn also reviewed the initial *Ackerman* complaint before it was filed. (Tr. at 96). Hirschhorn again billed the ad hoc committee for his time. (Tr. at 97).[6]

After the hearing, the Court informed the parties that it was sufficiently disturbed about the possibility of unethical conduct by plaintiffs' counsel to suspend all discovery pending its resolution of the motion to disqualify. The Court directed counsel for the *Ackerman* plaintiffs to provide to the Court *in camera* the notes Triggs made during the November 15th meeting he had with Hirschhorn, as well as any subsequent notes relating to any other conversations with Hirsch-

---

**5.** Hirschhorn also testified that prior to giving his evaluation of "potential counsel" to the ad hoc committee he did not "have the opportunity to" obtain Talansky's permission to do so. (Tr. at 23). This testimony is simply not credible.

**6.** Prior to the filing of the *Ackerman* complaint, several investors in the various NCC were sued by Travelers for failing to pay their balloon payments. (Tr. at 28, 64). Jacobson & Triggs agreed to defend the investors in those actions as part of their representation in *Ackerman*. (Tr. at

28). Hirschhorn was also named as a defendant by Travelers. While Triggs did not represent him, Triggs did arrange for local counsel in Philadelphia to serve as Hirschhorn's counsel. (Tr. at 29). In addition, Hirschhorn did not have to pay for his Philadelphia counsel. (Tr. at 140–41). Triggs also told Hirschhorn that he could not name him as a plaintiff in this action because Hirschhorn had "worked on the deals" which were the subject matter of the litigation. (Tr. at 29).

horn after that date. The Court further directed Hirschhorn to produce to the Court and parties all his time records as well as any bills to the ad hoc committee for his services.

*Discussion*

The issues before the Court are: (1) whether Hirschhorn's communications with Triggs and with the ad hoc committee violated the Code; and (2) if Hirschhorn did violate the Code, whether plaintiffs' counsel should be disqualified or their claims dismissed because plaintiffs rely upon improperly disclosed information.

### 1) *The Wrong*

■ When a disciplinary rule is raised in litigation, the Court is obligated to look to the relevant Code rule as a "guideline[ ] to be applied with due regard for the broad range of interests at stake."[7] *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 495, 558 N.E.2d 1030, 1032 (1990). In such circumstances, however, the Court is not required to read the Code literally or necessarily determine the intent of the drafters as it would a legislative statute. *Id.*

■ Canon 4 of the Code provides that "[a] lawyer should preserve the confidences and secrets of his client." A confidence is any information that is protected by the attorney-client privilege. The privilege is triggered when legal advice is sought from an attorney in his or her capacity as such, and the communications relating to that purpose are made in confidence by the client. The communications are permanently protected from disclosure, unless the privilege is waived. *United States v. Bein,* 728 F.2d 107, 112 (2d Cir.1984).

As defined by the Code, a "secret" encompasses a broader spectrum of information than the attorney-client privilege, and includes all information "gained in the professional relationship that the client requested to be held inviolate or the disclosure of which

would be embarrassing or would be likely to be detrimental to the client." DR 4–101.

Plaintiffs argue that Hirschhorn did not disclose any of his former clients' confidential or secret information. Plaintiffs further argue that defendants have not demonstrated how they have been prejudiced by Hirschhorn's disclosures. In making these claims, however, plaintiffs appear to ignore the applicable legal standards.

■ It is undisputed that Hirschhorn had access to his former clients confidential and secret information which is directly and substantially related to the subject matter of this dispute. Furthermore, Hirschhorn is involved in the prosecution of this case either as an interested party or as assistant counsel for plaintiffs. Therefore, the Court must presume that Hirschhorn disclosed confidential information. *See Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2d Cir. 1973) (former client only required to demonstrate than the matter concerning the pending suit is substantially related to the matters former attorney previously represented him in) *(citing T.C. Theatre Corp. v. Warner Bros. Pictures, Inc. et al.,* 113 F.Supp. 265 (S.D.N.Y.1953)); *Morin v. Trupin,* 728 F.Supp. 952, 955 (S.D.N.Y.1989) (the presumption that confidences and secrets were disclosed does not apply unless the attorney who allegedly disclosed the confidential or secret information seeks to prosecute the action either as a party or as counsel for plaintiff).

It is true that Hirschhorn has not formally appeared as a party or filed an appearance as counsel in either of the two cases consolidated before the Court. Indeed, Triggs and Hirschhorn explicitly agreed not to name Hirschhorn as a party or plaintiffs' counsel of record in order, the Court finds, to avoid the clear intent of the governing rules. However, his conduct demonstrates that he was in fact acting as both a lawyer and as a party here.

---

7. The Code of Professional Responsibility (the Code") was written by the American Bar Association in August 1969 and has been adopted by the New York State Bar Association and promulgated as rules of the Appellate Divisions of the Supreme Court of New York on September 1, 1990. The Code has also been recognized by the Second Circuit as the relevant guideline for proper professional conduct in this Court. *Hull v. Celanese Corp.,* 513 F.2d 568, 571 n. 12 (2d Cir.1975).

Hirschhorn has acted as plaintiffs "counsel" in a variety of ways. He assisted the ad hoc committee with a number of matters, including the hiring of Jacobson & Triggs. He actively assisted Jacobson & Triggs in developing the legal theories presented in the complaints. In addition, Hirschhorn reviewed the initial *Ackerman* complaint before it was filed and billed the ad hoc committee for doing so. Finally, Hirschhorn read this Court's September Opinion and discussed it with Triggs over the telephone. (Tr. at 92–93).

Hirschhorn also acted as a party. In that role, he provided Triggs with substantial factual information for the purpose of drafting the *Ackerman* complaints. Hirschhorn was also an investor in one of the NCC partnerships, and had been sued, like many of the other plaintiffs, by Travelers for failure to pay the balloon payment.[8] In deciding which law firm would represent the plaintiffs in this case, it was understood by the members of the ad hoc committee that whatever law firm was hired to pursue claims against the defendants would also defend Hirschhorn and the other plaintiffs in the actions instituted by Travelers in Pennsylvania. Finally, he testified that he believed he would have named a plaintiff in this dispute had he not worked on the very deals which are the subject of this litigation.[9] (Tr. at 28–29).

Under these circumstances, the Court finds that Hirschhorn was assisting in the representation of the plaintiffs while also acting as a party. Accordingly, it is presumed that the NPA and United Growth Defendants disclosed confidences and secrets to Hirschhorn which bear directly on the subject matter of this action. *T.C. Theatre Corp.*, 113 F.Supp. at 268–69; *see also MMR/Wallace Power & Industrial, Inc. v. Thames Assoc.*, 764 F.Supp. 712, 726 (D.Conn.1991) (presumption of disclosure arises where plaintiff's former employee, who was not a party in the action but had assisted plaintiff's counsel, revealed information to defendant's attorney).

Even if the presumption of disclosure did not apply in this case, the record before the Court demonstrates that Hirschhorn did in fact reveal the secrets of the NPA and United Growth Defendants in his discussions with the ad hoc committee and with Triggs and that those revelations were likely to be detrimental to his former clients. At the evidentiary hearing Hirschhorn acknowledged that his chief responsibility at NPA was to help structure the very NCC partnership deals which are challenged in the complaints. (Tr. at 107).

Moreover, the purpose of Hirschhorn's November 15, 1991 meeting and subsequent telephone conversations with Triggs was to provide Triggs with information about Hirschhorn's former clients to support Triggs' initial and amended complaints. Indeed, as demonstrated more fully below, the subject matter of Hirschhorn's discussions with Triggs form the basis of plaintiffs' factual allegations.[10]

Plaintiffs contend that Hirschhorn was not acting in his capacity as an attorney when he helped prepare the PPMs for the NCC partnerships, and therefore was not revealing any confidential information when he discussed with Triggs and the ad hoc committee how the NCC partnerships and 1989 roll-up were structured. Plaintiffs also contend that

---

**8.** Hirschhorn also testified that by the summer of 1991 he was unable to pay his capital contribution as an investor in NCC II. He also understood that in April 1992 he was facing a $28,000 balloon payment. It was under these desperate financial circumstances, that Hirschhorn worked for and billed the ad hoc committee and first had "conversations" with Triggs. (Tr. at 64–67)

**9.** Hirschhorn further testified that had Triggs not advised against it, he believed that Talansky would have permitted him to be named as a plaintiff. (Tr. at 31). Given Hirschhorn's undisputed role with NPA and United Growth, that testimony is simply not credible.

**10.** Plaintiffs insist that Hirschhorn was free to disclose information he learned from "third parties" other than his former clients because he had no attorney-client relationship with them. Given the professional relationship between Hirschhorn's former clients and the "third party" defendants, the information Hirschhorn received from third parties and disclosed to plaintiffs was nevertheless secret information because its disclosure would likely be detrimental to Hirschhorn's former clients.

Hirschhorn told Triggs that there were certain matters he would not be able to discuss on account of the attorney-client privilege. However, Hirschhorn's testimony at the hearing was not credible on this subject in light of the complete absence of such an important discussion in Triggs' notes. On the contrary, the Court finds that these two attorneys all but ignored their ethical obligations notwithstanding Hirschhorn's lip service.

Plaintiffs fail to address the fact that even if Hirschhorn did take precautions not to reveal his former clients' confidential information, he nevertheless still violated his ethical obligations. *See Doe v. A. Corp.*, 330 F.Supp. 1352, 1355 (S.D.N.Y.1971) ("Canon 4 ... looks beyond technical considerations of secrecy ... and shields all information given by a client to his attorney whether or not strictly confidential in nature. The sole requirement under Canon 4 is that the attorney receive the communication in his professional capacity."); *Ullrich v. The Hearst Corp.*, 809 F.Supp. 229 (S.D.N.Y.1992) (Leval, J.) ("Adverse use of confidential information is not limited to disclosure. It includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject ..."); *see also Hull v. Celanese Corp.*, 513 F.2d 568, 571–72 (2d Cir.1975) (precautions did not negate violation of ethical rules).

As in *Morin*, the very purpose of Hirschhorn's discussions with Triggs was to aid plaintiffs in their lawsuit against Hirschhorn's former clients and their business associates over a subject matter about which Hirschhorn was intimately familiar and concerning the very "conduct and events that plaintiffs have alleged render defendants liable." *Morin*, 728 F.Supp. at 956 (where testimony revealed that attorney had gained disclosed information as a result of his employment by his former clients, the Court found that attorney had revealed secrets). Therefore, even if Hirschhorn did act in both a legal and business capacity for the NPA and UGP defendants, and even if he did inform Triggs, pro forma, that there were certain matters he would not discuss because of the attorney-client privilege, Hirschhorn nevertheless violated his ethical obligations to his former clients when he revealed information to plaintiffs' counsel concerning the NCC partnerships which he clearly knew would be detrimental to them.

### 2) *The Remedy*

■ Having concluded that Hirschhorn violated the Code, the Court must now decide what to do about it. Defendants urge the Court to disqualify both Jacobson & Triggs and Beigel & Sandler. They further ask the Court to dismiss the complaints based upon Hirschhorn's improper disclosure.[11]

In deciding how properly to deal with Hirschhorn's unethical conduct as it relates to this consolidated action, the Court recognizes the need to prohibit plaintiffs from obtaining an advantage that they would not otherwise have achieved but for Hirschhorn's disclosures. Disqualification of a party's chosen counsel, however, is a severe remedy which should only be done in cases where counsel's conduct will probably "taint the underlying trial." *Morin*, 728 F.Supp. at 957; *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). Here, such a remedy is warranted.

■ Even though Jacobson & Triggs and Beigel & Sandler never represented any of the defendants themselves, they deliberately and knowingly affiliated themselves with an attorney who did. In addition, Jacobson & Triggs and Beigel & Sandler, by their own admissions, substantially relied upon Hirschhorn's "inside" information in drafting their

---

**11.** The Court recognizes that Hirschhorn only formally represented NPA and United Growth. Nevertheless, each of the defendants remaining in the case have standing to move for disqualification of plaintiffs' counsel and dismissal of the complaints based upon violations of the Code. *See Kevlik v. Goldstein*, 724 F.2d 844, 847–48 (1st Cir.1984) (even if movant does not represent the owner of the attorney-client privilege, movant may still move to disqualify); *Matter of Beiny*, 129 A.D.2d 126, 517 N.Y.S.2d 474 (1st Dep't 1987), *appeal dismissed*, 71 N.Y.2d 994, 529 N.Y.S.2d 277, 524 N.E.2d 879 (1988) (granting motion to suppress documents and disqualify counsel even though moving party was not owner of privilege).

complaints. By doing so, Jacobson & Triggs and Beigel and Sandler—like Hirschhorn—contravened the Code in a manner which has caused prejudice to the defendants in this action. Accordingly, neither firm may continue representing plaintiffs here.

The need to disqualify Jacobson & Triggs is clear. Triggs was the one who met with Hirschhorn and spoke with him numerous times over the telephone. (Tr. at 79). On each of those occasions, Triggs knew or should have known that he was talking to an attorney who had previously represented the key defendants in this action. Rather than minimize his contact with Hirschhorn, however, Triggs pursued Hirschhorn's information zealously, in order to take advantage of Hirschhorn's inside and obviously secret information.

More importantly, Hirschhorn was not just a source of secret and possibly confidential information. He was, for all practical purposes, acting as Triggs co-counsel. Not only do Hirschhorn's own bills reveal that he spent over 120 hours assisting plaintiffs in the prosecution of the two actions, but Triggs' notes confirm such a role. Under these circumstances, Triggs should have know that Hirschhorn was violating ethical obligations both to NPA and to United Growth and that he was assisting in Hirschhorn's improper conduct.

Given the scope of Hirschhorn's involvement with Jacobson & Triggs, the Court finds that Jacobson & Triggs' continued representation of the *Ackerman* plaintiffs creates a substantial likelihood that NPA and United Growth's confidential and secret information would inevitably be used to prosecute this action and unfairly prejudice defendants. Therefore, Jacobson & Triggs is disqualified from representing any of the remaining plaintiffs in this action.

The grounds for disqualifying Beigel & Sandler are equally compelling. Like Triggs, Jaskiel told the Court that "plaintiffs

... learned of the fraud from an insider who provided information which *could not have been obtained from any other source."* (Jaskiel Ltr. at 2, emphasis added). In addition, in its opposition papers, Beigel & Sandler do not provide an independent basis for the factual allegations detailed in the *Remington* complaint, but rather emphasize its reliance on Hirschhorn: "[defendants] make much about plaintiffs' statement that Hirschhorn provided the information which revealed the fraud. Plaintiffs do not back away from this statement. Hirschhorn provided the details of the fraud which allowed the complaint to pass 9(b) muster with flying colors."

In sum, Beigel & Sandler's conduct is indistinguishable from Jacobson & Triggs because in drafting its initial and amended complaints, it relied almost exclusively on Hirschhorn's improper disclosures. Even if no member personally met with Hirschhorn, Beigel & Sandler has improperly benefitted from Hirschhorn's disclosures. Because Beigel & Sandler has taken no steps to insulate itself from Triggs and/or Hirschhorn, it must not be permitted to take unfair advantage of its "tainted" knowledge. Therefore, Beigel and Sandler is also disqualified from representing any of the remaining plaintiffs in this action. *See Fund of Funds v. Arthur Andersen & Company,* 567 F.2d 225, 236 (2d Cir.1977) (plaintiffs' law firm disqualified because it was in a position to receive privileged information from defendant's former law firm); *see also Cheng v. GAF Corp.,* 631 F.2d 1052, 1057–58 (2d Cir.1980) (screening held to be ineffective method of ensuring that confidential information is not utilized), *vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981).[12]

The Court must next consider whether the complaints should be dismissed because of counsels' conduct. Canon 4 of the Code requires that a Court do what is appropriate to ensure that any confidential and secret information disclosed by a party's formal counsel

---

**12.** Hirschhorn's proper course of conduct should have been to inform his former clients of their improper behavior at the time it was allegedly occurring and attempt to remedy their wrongs. Instead, Hirschhorn did nothing. That is, of course, until his own balloon payment became due and his interests became an issue. He then magnified his improper conduct by disclosing his clients' secrets to plaintiffs' counsel who in turn improperly used the information to the direct disadvantage of Hirschhorn's former clients.

not subsequently be used against that same party in another litigation. In some cases, courts have dismissed actions which are based upon improperly disclosed information. *See Doe,* 330 F.Supp. at 1355 (S.D.N.Y.1972); *Eckhaus v. Alfa–Laval, Inc.,* 764 F.Supp. 34 (S.D.N.Y.1991).

■ In this case, it is beyond dispute that Hirschhorn had a significant relationship with the ad hoc committee and plaintiffs' counsel both before and after the original and amended complaints were filed. Under these circumstances, the Court finds that the only appropriate and fair remedy is to re-evaluate defendants' prior motions to dismiss. As detailed more fully below, there is no question that plaintiffs' counsel relied exclusively and extensively on attorney Hirschhorn to support their allegations of wrongdoing. Therefore, the motions to dismiss are granted and the complaints are hereby dismissed without prejudice. *See Doe,* 330 F.Supp. at 1355 (dismissing complaint and disqualifying counsel where all allegations in complaint were acquired during attorney's representation of defendant as in-house counsel). *See also Link v. Wabash Railroad Co.,* 370 U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) (dismissal of claim due to chosen counsel's unexcused behavior does not impose unjust penalty on client).

*The NPA Defendants*

The remaining claims against the NPA defendants are brought by plaintiffs residing in New York, New Jersey, Indiana and South Carolina for common law fraud. In initially denying the NPA Defendants' motion to dismiss these fraud claims, the Court relied upon the allegations concerning the license fee, the HUB management system, the financial projections, and the undisclosed indemnity agreements between Travelers and NPA. It is not even seriously disputed by the parties that these allegations, which are contained in both complaints, are premised on information Hirschhorn disclosed to Triggs. (Triggs Ltr. at 2–3; Tr. at 26, 77–78, 104). Because the Court will not permit plaintiffs to reap the benefit of NPA's confidential and secret information, the Court grants the NPA defendants' motion to dismiss the two complaints without prejudice.

*The United Growth Defendants*

The allegations which the Court relied upon in denying the United Growth Defendants' motion to dismiss the common law fraud claims against them concerned the circumstances surrounding the 1989 roll-up of ten of the twelve NCCs. Specifically, plaintiffs allege that as the controlling person of United Growth, Talansky, breached his fiduciary obligations by making material misrepresentations and omissions in the United Growth PPM. Plaintiffs also allege that in at least two of the NCCs, Talansky improperly voted his limited partnership interests in order to obtain the votes necessary to approve the roll-up. Finally, plaintiffs allege that with respect to two NCCs, the United Growth Defendants failed to notify the investors of their right to rescind the roll-up due to the failure of the lenders holding the mortgages to consent to the transaction.

One of the topics Triggs admitted discussing with Hirschhorn was the United Growth Defendants' "communications with investors concerning their votes in the roll-up." (Triggs Ltr at 3). In addition, Hirschhorn testified that he was still employed by the United Growth Defendants and participated directly in putting together the roll-up. Finally, the notes Triggs supplied to the Court *in camera* support plaintiffs' allegations concerning the improper motivation behind the roll-up and the lack of the required lender consent. In sum, the record before the Court supports the conclusion that without the information obtained from Hirschhorn, plaintiffs would not be able to sustain their remaining claims against the UGP defendants. Therefore, those claims are dismissed without prejudice.

*Spengler Carlson*

The allegations upon which the Court relied in denying Spengler Carlson's motion to dismiss the aiding and abetting claim in the *Ackerman* complaint concern Spengler Carlson's involvement in the 1989 roll-up. Specifically, plaintiffs allege that Spengler Carlson had knowledge of and provided assistance to Talansky in breaching his fiduciary duty.

If not for Hirschhorn's improper disclosures, as evidenced from Triggs' notes, the aiding and abetting claim against Spengler Carlson would not have been made. Accordingly, Spengler Carlson's motion to dismiss that claim is granted and the complaint against Spengler Carlson is dismissed without prejudice.

*Weiner Zuckerbrot*

The only claims remaining against Weiner Zuckerbrot are the claims alleging common law fraud by plaintiffs who invested after December 19, 1985. According to the *Ackerman* complaint, Weiner Zuckerbrot, through its partner Kenneth Zuckerbrot, created the HUB license fee arrangement for the NCCs' service mark and knew that the license fee was "fraudulently described" to the investors in the PPMs. Additionally, plaintiffs allege that Weiner Zuckerbrot knew the license fee was conceived as a source for additional revenue for NPA.

In the October 20, 1992 letter to the Court, Triggs stated that "the creation of the HUB license concept" was one of the topics he discussed with Hirschhorn at their November 15 meeting. In addition, while Hirschhorn testified that he did discuss Kenneth Zuckerbrot with Triggs, he did not tell Triggs that Zuckerbrot created the license fee concept for NPA. (Tr. at 79). This testimony, however, is not consistent with Triggs' notes. Therefore, because the more credible evidence before the Court demonstrates, that but for Hirschhorn's improper disclosures to Triggs, the *Ackerman* plaintiffs would fail to sustain a claim against Weiner Zuckerbrot, the remaining fraud claims against that defendant are dismissed without prejudice.

*Price Waterhouse*

The only claim remaining against Price Waterhouse is the *Ackerman* plaintiffs' claim of common law fraud.[13] The *Ackerman* plaintiffs allege that in or about mid-June 1985, Sue Smith ("Smith") a Price Waterhouse employee, had a telephone conversation with a representative at NPA and communicated her concern about the HUB license fee which was to have been paid to NPA in NCC II. Price Waterhouse received no response from NPA regarding Smith's request and allegedly failed to take further proper steps to investigate how the funds generated from the license fee were being spent.

As stated above, one of the eight topics of conversation Hirschhorn discussed with Triggs at their November 15, 1991 meeting was whether Price Waterhouse, or any of the other third-party professionals, had inquired about how the money generated by the HUB license was being spent.

At the evidentiary hearing, Hirschhorn testified that he spoke with Smith over the telephone quite regularly while he was working for NPA and that Smith was interested in "what things NPA was doing in connection with their responsibilities under the license fee arrangement, as detailed in the private placement offering." (Tr. at 86–87). Moreover, when Hirschhorn was asked what if anything he told Triggs about Price Waterhouse's obligation to further investigate Smith's concerns, Hirschhorn responded evasively that he couldn't recall but then he said "I remember telling him that I was going to try to find out the answer, and I think I told him that nothing ever happened beyond that. There was nothing beyond that conversation with Sue. There was no follow up conversation." (Tr. at 90). Finally, the notes Triggs supplied to the Court support the contention that if it were not for Hirschhorn's disclosures, the *Ackerman* plaintiffs would not be able to sustain a claim against Price Waterhouse. Accordingly, because the remaining fraud claims against Price Waterhouse derive solely from information improperly revealed by Hirschhorn, they are dismissed without prejudice.

*Travelers*

The only remaining claims against Travelers are for common law fraud claim based upon Travelers' alleged failure to disclose

---

**13.** In its September Opinion, the Court dismissed as time barred plaintiffs' claim against various defendants, including Price Waterhouse, for aiding and abetting a breach of fiduciary duty. In the Opinion, however, the Court inadvertently omitted Price Waterhouse's name. That omission is corrected here.

"secret" indemnities issued to it by NPA as well as Travelers' alleged assistance with the false financial projections contained in the PPMs.

Hirschhorn testified that he disclosed to Triggs NPA's relationship with Travelers and Travelers' role in the NCC transactions including any special arrangements between NPA and Travelers. (Tr. at 24–25, 74–75, 77). Moreover, in his October 20, 1992 letter to the Court, Triggs acknowledged that one of the eight topics he discussed with Hirschhorn included the "negotiations and relationship of Travelers to the deals and whether or not Travelers had any special arrangements in connection with these deals."

Hirschhorn only knew about Travelers relationship with NPA because Hirschhorn was NPA's lawyer and discussed those matters with his client NPA. Therefore, because the allegations in the complaint relating to Travelers' fraud would not have been accessible to Triggs but for Hirschhorn's breach of his ethical obligations to his former client, that information must be purged from the *Ackerman* complaint. Without that information, the *Ackerman* complaint fails to state a proper claim of common law fraud against Travelers and must be dismissed without prejudice.

*Supplemental Jurisdiction*

In its September Opinion, the Court, exercising its discretion, elected to retain supplemental jurisdiction over plaintiffs' remaining state law claims. *See Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) ("a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case … involving pendent state-law claims.").

Given the above stated findings, however, should either the *Ackerman* or *Remington* plaintiffs seek to amend its complaint in a manner consistent with this decision, the Court would decline to continue exercising its supplemental jurisdiction over this case. 28 U.S.C. § 1367(c)(3) and (4).

*Conclusion*

For the foregoing reasons, defendants' motion to disqualify plaintiffs' counsel is granted. Defendants' motion to dismiss the complaints is also granted without prejudice.

SO ORDERED.