### In re MANSHUL CONSTRUCTION CORP., et al., Debtors.

**Yann Geron, Trustee of the Estates of Manshul Construction Corp. and Manshul Construction Company (Bronx), Inc., Debtors, Plaintiff,**

**v.**

**Allan G. Schulman individually, as Trustee of the Ethan Michael Schulman Trust and the Brett Adam Schulman Trust, as Custodian of Custodial Accounts Maintained for the Benefit of Ethan Michael Schulman and Brett Adam Schulman, Minors, and as the personal representative of the Estate of Julius Schulman, Deceased; Nancy Schulman individually, as Trustee of the Ethan Michael Schulman Trust and the Brett Adam Schulman Trust, and as Custodian of Custodial Accounts Maintained for the Benefit of Ethan Michael Schulman and Brett Adam Schulman, Minors; the Estate of Julius Schulman, Deceased; the Ethan Michael Schulman Trust; the Brett Adam Schulman Trust; Annette Fogelman individually, and as Trustee of the Ethan Michael Schulman Trust**

and the Brett Adam Schulman Trust; Stanley Meyerowitz as trustee of the Ethan Michael Schulman Trust and the Brett Adam Schulman Trust; Viscount Properties, Inc.; and Janal Properties Corp., Defendants.

**Bankruptcy Nos. 96 B 44080 JHG, 96 B 44079 JHG. Adversary No. 97–8748. Dist. Ct. 97 Civ. 8851 JGK.**

United States Bankruptcy Court, S.D. New York.

Jan. 11, 1999.

■■■■
_____

Salomon Green & Ostrow, P.C. by Alec P. Ostrow, New York City, for Chapter 7 Trustee.

Judd Burstein, P.C. by Judd Burstein, New York City, for Defendants except Nancy Shulman.

Hahn & Hessen, LLP by Gilbert Backenroth, New York City, for Defendant Nancy Shulman.

Law Offices of Neal Brickman, by Neal Brickman, New York City, for Aetna Casualty & Surety Co.

Carolyn A. Schwartz by Rajean Battan, United States Trustee, New York City.

## DECISION ON DEFENDANTS' MOTION (1) TO DISQUALIFY THE TRUSTEE AND HIS PROFESSIONALS FROM THIS ADVERSARY PROCEEDING (2) TO DISMISS THE AMENDED COMPLAINT WITHOUT PREJUDICE, (3) FOR A PROTECTIVE ORDER AND (4) FOR CERTAIN DISCOVERY

JEFFRY H. GALLET, Bankruptcy Judge.

Allan G. Shulman ("Shulman"), his wife Nancy Schulman ("Nancy Shulman") and the other named defendants (collectively the "Defendants") move[1] for an order to (1) remove, or disqualify, Yann Geron, the chapter 7 Trustee (the "Trustee"), as a plaintiff in this adversary proceeding;[2] (2) disqualify the Trustee's counsel, Salomon Green & Ostrow ("SGO"), and his accountants, BDO Siedman ("BDO"); (3) dismiss the amended complaint without prejudice; (4) grant a broad protective order to prevent the further utilization of allegedly privileged materials that were allegedly wrongfully solicited from Carol G. Sigmond, Esq. ("Sigmond"), the Debtors' former in-house counsel and former personal attorney to Shulman; and (5) grant discovery concerning the Trustee's alleged violation of District Court Judge Charles Brieant's order (the "Brieant Order")[3] staying my decision and order approving the Trustee's application to retain Sigmond.

For the reasons set forth below, Defendants' motion is denied in all respects.

## BACKGROUND

Manshul Construction Corp. ("Manshul") and Manshul Construction Company (Bronx) ("Manshul (Bronx)") (collectively the "Debtors") filed for bankruptcy, under chapter 11 of the United States Bankruptcy Code (the "Code"), on July 31, 1996. Prior to filing, the Debtors were in the construction business, specializing in government contracts. Schulman was Manshul's president and the sole shareholder of both debtors. Sigmond was president of Manshul (Bronx).

At the time of filing, the Debtors had no operating construction jobs or outstanding bids. Their primary assets were causes of action for damages against the owners of

---

**1.** On February 26, 1998, this adversary proceeding was removed to the United States District Court for the Southern District of New York (Koeltl, J.). It was returned to me by the District Court until it was trial ready. I certified it trial ready on April 23, 1998. On or about September 14, 1998, the Defendants made this motion to the District Court. In resolution of one part of the Trustee's objection to the Defendants' motion, the parties agreed to have me hear and decide their motion. Judge Koeltl then referred it to me.

**2.** The Defendants' motion was originally styled as one "for an order under the broad equity powers of this Court, (i) removing the Trustee from this adversary proceeding pursuant to 11 U.S.C. § 324(a)." At oral argument, Defendants conceded that their motion was not artfully drafted and that they were not moving pursuant to

§ 324(a). Rather, Defendants argued that they were seeking to disqualify the Trustee as they would any other party-plaintiff and that § 324(a) is persuasive. Had the Defendants moved pursuant to § 324(a), I would have denied their motion on two grounds. First, I have already ruled in a prior written decision that Allan and Nancy Shulman do not have standing in the bankruptcy case and therefore would not be entitled to object here. See In re Manshul Constr. Corp., 223 B.R. 428 (Bankr.S.D.N.Y.1998). Second, the Defendants gave notice of their motion only to their adversaries and the United States Trustee. A motion under § 324(a) requires notice to all creditors.

**3.** As a matter of practice, I do not refer to cases by the name of judge who presided. I do so here *only* to avoid confusion.

certain construction projects where the Debtors were contractors. The Debtors were also defendants in more than 130 lawsuits brought by subcontractors and others. As a practical matter, they had left the construction business and were in the litigation business.

Most of the Debtors' obligations to their customers, sub-contractors and suppliers were guaranteed by Aetna Casualty and Surety Company ("Aetna") pursuant to several payment and performance bonds. Aetna is the Debtors' largest creditor. As it paid, and continues to pay, various of the Debtors' other creditors, it succeeds to their claims. Shulman and the Debtors guaranteed the bonds.

The Debtors operated as a debtors-in-possession until December 5, 1996, when I converted the case to one under chapter 7 of the Code. The Trustee was immediately appointed and, shortly thereafter, I approved the retention of SGO.[4]

On February 27, 1997, the Trustee made an application to retain Sigmond as his special attorney/advisor pursuant to § 327(e) of the Code. I held an evidentiary hearing and, by decision read into the record on April 16, 1997, approved the Trustee's application (the "Retention Order"). The Debtors appealed the Retention Order and gained a stay pursuant to the Brieant Order. On July 20, 1998, District Court Judge Deborah Batts reversed the Retention Order (the "Batts Decision").[5]

In July 1997, the Trustee initiated this adversary proceeding against Shulman, Nancy Shulman, and others, to recover monies allegedly fraudulently conveyed to them and certain corporations under their control (the "Fraudulent Conveyance Action"). The Trustee's amended complaint states causes of action under 11 U.S.C. §§ 544 & 550 and New York Debtor & Creditor Law §§ 273–276. The Trustee seeks a money judgment against Shulman in the amount of $11,403,-952.85 and against Nancy Shulman in the amount of $2,390,000.00. Shortly after initiating the Fraudulent Conveyance Action, the

Trustee moved to restrain the Defendants from transferring their assets and for an order of attachment. That motion was resolved by a stipulation (the "Stipulation"), which I "So Ordered." The Stipulation restricted the alienation of certain assets and limited expenditures by the Defendants. The Stipulation has been renewed and extended and remains in effect.

The eye of the storm is Sigmond. During her association with Shulman and the Debtors, Sigmond wore three hats. During the time the Debtors operated a functioning construction business, she was Shulman's personal attorney, in-house counsel to the Debtors and the President of Manshul (Bronx).

The Defendants argue that the Trustee, and his professionals, had contacts with Sigmond where she breached her attorney-client privilege with Shulman by revealing his secrets and confidences. Thus, they conclude, the Trustee, and his professionals, have violated the canons of ethics and their case against the Defendants is tainted and requires their disqualification. The Trustee replies that as trustee, he had a legal right to question Sigmond about the Debtors' affairs. He and his professionals aver that they never had conversations with Sigmond that impinged on any privilege that belonged to Shulman.

### FACTS

Sigmond first began working for the Debtors in 1992 when she was associated with "Berman Paley," a law firm that represented the Debtors in subcontractor litigation. In or about 1994, Sigmond left Berman Paley and began to work as the Debtors' in-house counsel. At the same time, she also began advising Shulman in certain personal legal matters, although she was paid only by the Debtors until just before the bankruptcy filing.

Sigmond's representation of Shulman focused largely on two subjects. First, in May 1994, the United States Attorney filed a criminal complaint against Schulman, Manshul and others in the Southern District of

---

4. SGO's retention order was signed on January 13, 1997, *nunc pro tunc* to December 5, 1996.

5. The Batts Decision can be found at 1998 WL 405039 (S.D.N.Y. Jul. 20, 1998).

New York (the "Criminal Case") charging them with conspiracy and bribery of a public official. To date, no indictment has been returned, or other criminal proceeding commenced, against them. Sigmond advised Shulman in connection with those charges. In addition, she worked closely with Andrew J. Maloney ("Maloney"), an attorney with Brown & Wood, who represented Shulman in the Criminal Case. Maloney stated [6] that Sigmond was "intimately involved in the formulation and implementation of strategies with respect to Mr. Shulman's defense."

Second, in August 1996, Aetna commenced an action in Supreme Court, New York County against Shulman and the Debtors. Sigmond counseled Shulman with respect to his defenses to the indemnity claims and worked closely with Shulman's attorney of record in drafting pleadings, motions and memorandum of law.

The Defendant's allege that, following the conversion the case to a liquidation under chapter 7 and the appointment of the Trust-ee, there were improper contacts between Sigmond, on the one hand, and the Trustee and his professionals, on the other. Furthermore, it is alleged that during these improper contacts Sigmond revealed secrets and confidences that were uniquely the Defendants' to the Trustee and his professionals, either directly or indirectly.

The following are all of the known contacts between the relevant parties prior to the Brieant Order in mid-1997, which stayed the Trustee's retention of Sigmond.

The Trustee first met Sigmond in December 1996. He states that Sigmond was introduced to him as "counsel to Manshul" and she told him that "she knew nothing of the internal finances of Manshul or the transfers of moneys from Manshul to any of the Defendants." *Geron Aff.* ¶ 5.[7] She also told him that "she would refuse to discuss any such issues under any circumstances." *Id.*

The Defendants offer the time records of the Trustee, SGO and MR Weiser, the Trustee's former accountant. The entries identify their contacts with Sigmond prior to the period they applied to retain her.

*The Trustee's Time Records*

Date    Description

12–9–96    Asset Disposition: Review series of background docs re pending stlmts [sic] of various open Ks (2.6); ts N Brickman, APO etc re same and re status (0.5); Ts auctioneer re recovery and securing of assets (0.2); T Carol Sigmund [sic] re status and records (0.3)

12–11–96    Asset Disposition: 2 Ts R Strauss re sale of inventory strategy (0.3); T M Brecker re same (0.1); Many T's APO, Beckerman, Weiss, Sigmund [sic], accountants, etc. re background, carve-out mtgs, and strategy (2.9)

12–19–96    Asset Disposition: Several Ts C Sigmund [sic], C Ijadi etc (1.4); review results of UCC search and Aetna security/indemnity agreement (0.7)

12–13–96    Trustee Time: Prepare for and attend mtgs at 919 w/ C Sigmund [sic], Aetna's counsel, MR Weiser and SG re background, strategy, carve-out, open litigations, etc (11:45–6:15)(6.5)

---

**6.** Maloney's affidavit is annexed as exhibit D to the Motion. It was originally submitted to the United States District Court for the Eastern District of New York in connection with an action by the United States against the Debtors and Aetna. In that case, Shulman made a motion to disqualify Sigmond as counsel to Aetna. The court ultimately denied Shulman's motion. *See* *United States v. Manshul Constr. Corp.,* No. 94 CV 2436, slip op. (E.D.N.Y. Aug. 6, 1997) (Pollack, M. J.).

**7.** "Geron Aff." refers to the September 29, 1998 affidavit of Trustee Yann Geron submitted in opposition this motion.

*Ostrow's Time Records (SGO)*

| Date | Description |
|---|---|

12-13-96   Meetings w/ [Yann Geron]—B. Katz—C. Ijadi—C. Sigmond . . . re describe C. Sigmond role and input (3.0) . . .

12-18-96   T/C Sigmond re conflict issue on Aetna rep raised by M. Brecher [sic] and preliminary research on effect of guilty plea (0.4); T/YG to report T-conversation (0.1)

*MR Weiser Time Records*

| Date | Description |
|---|---|

12/13/96   Meeting with the Trustee, Counsel for the Trustee, Counsel for Aetna, special consultant [Sigmond] (6.0)

12/19/96   Met with [Sigmond], special consultant to the Trustee re: various construction litigation matters. (1.3)

1/3/97   Met with [Sigmond] re: status of records for construction litigation matters. (2.2)

2/13/97   Telephone call with [Sigmond], (in house counsel) (.4)

2/13/97   Met [Sigmond] at Debtor's premises, respond to her inquiries relative to her documents, and files and property. (.7)

2/13/97   Subsequent numerous telephone calls with Neil Brickman, [SGO]; Trustee's office, and [Sigmond] as to [Sigmond] files and property. (1.1)

2/18/97   Prepare memorandum relative to issues relating to property of [Sigmond] and discussions with her (2.8).

2/21/97   At warehouse space, assisted [Sigmond] and Lilly Wong in searching for documents relative to litigation matters (9.7).

2/22/97   At warehouse space, assisted [Sigmond] and Lilly Wong in searching for documents relative to litigation matters (7.6).

2/23/97   At warehouse space, assisted [Sigmond] and Lilly Wong in searching for documents relative to litigation matters (6.2).

---

The Trustee and his professionals also had contacts with Sigmond after the Brieant Order was issued. In addition to the memorandum described below, the parties submitted affidavits specifying these contacts and provided further explanation during oral argument.

*Brickman's January 1998 Memorandum to SGO*

Neil Brickman ("Brickman"), counsel to Aetna, sent a memorandum, which memorialized a January 1998 conversation he had with Sigmond that he titled "Possible Depositions in Bankruptcy Fraudulent Conveyance Action" (the "January Memo"), to SGO. The Defendants point to the following sections of the January Memo:

Ms. Sigmond indicated to me that the following individuals—all former Manshul employees—would be the most knowledgeable deponents regarding the status of Manshul's construction projects and how the company dealt with its subcontractor payables: . . . Garry Blake . . . Al Hoagland . . . Marty Sugarman . . . Sal Calatafarno . . . [and] Rae Chamkin . . .

\* \* \*

Ms. Sigmond advises me that Ms. Chamkin—who was terminated—". . . knows where all the bodies are buried." This was not a person that Ms. Sigmond identified for me in our first telephone conversation. She called me back expressly to identify this individual . . . .

\* \* \*

Of course, [Sigmond] is the person most knowledgeable about the subjects you need to explore. She is, however, an angry, and potentially uncooperative witness. She raised three (3) specific concerns relating to your taking her deposition:

(1) she wanted to be paid for her time;

(2) she needs the documents—particularly the subcontractor files—in order to accurately and precisely respond to your anticipated inquiries; and

(3) she is unwilling to subject herself to what she perceives as "harassing" cross-examination from Mr. Brecker [Shulman's prior counsel in this proceeding].

She also raised concerns regarding her busy schedule and potential "unavailability." She suggested that she could perhaps be more helpful to you if you simply "got together with her" and together review the relevant files. Unfortunately, it is a sticky problem to which I have no recommended solution.

*See January Memo.*

The January Memo, Brickman asserts, was the only communication he had with the Trustee, or his professionals, concerning the content of his communications with Sigmond.

### Yann Geron, the Chapter 7 Trustee

In all, the Trustee states that he had nine telephonic conversations with Sigmond after the Brieant Order. Of these nine conversations, seven related to a pending litigation between the Debtors and the Yonkers Board of Education ("YBE"). The balance of the telephone calls concerned pending fee appli-

cations and the Trustee's proposed action for turnover of alleged preferential transfers held by Sigmond. The Trustee did not pursue this action after Sigmond explained the transfers to the Trustee's satisfaction. *See Geron Aff.* ¶¶ 12–13. The Trustee believed that the contract with YBE had "a balance due to Manshul . . . ." *Geron Aff.* ¶ 8. His telephone conversations with Sigmond, who acted as lead counsel in the YBE litigations, touched on "the facts and circumstances occurring during the construction phase of [the] contract which she said would help [him] resolve Manshul's claims against [YBE]." *Id.* ¶ 9. The Trustee states that he also had telephone conversations with Sigmond concerning the YBE litigations where she provided information about "the underlying contracts, change orders, and requisitions." *Id.* ¶ 11. The Trustee ultimately recovered $412,000 from YBE.

### SGO, Counsel to the Chapter 7 Trustee

Chester Salomon ("Salomon"), an SGO partner, states that he had no contact with Sigmond during the period following the Brieant Order. He admits, however, that he spoke with Brickman in early 1998 "in the expectation that [Aetna] may identify Manshul employees familiar with key projects and office affairs." *Salomon Aff.* ¶ 4.[8] Thereafter, Brickman sent him the January Memo.

Alec Ostrow ("Ostrow"), also an SGO partner, had three contacts with Sigmond following the Brieant Order. First, on May 6, 1997, Ostrow telephoned Sigmond to inform her that District Court Judge Brieant had issued a stay. Second, Ostrow and Sigmond had a chance encounter on a Manhattan street where they "exchanged polite greetings." Third, on April 14, 1998, Ostrow questioned Sigmond at a deposition noticed by both the Trustee and the Defendants.

Walter Benzija ("Benzija"), an SGO associate, states he had one contact with Sigmond after the Brieant Order. That contact was a telephone call on June 30, 1997 "in which Ms.

---

**8.** "Salomon Aff." refers to the September 29, 1998 affidavit of Chester Salomon submitted in opposition this motion.

Sigmond inquired about the status of the appeal before Judge Batts." *Benzija Aff.* ¶ 2.[9] Benzija responded that the appeal had not been decided.

## DISCUSSION

This is an extraordinary and apparently unprecedented motion. The Defendants seek to disqualify a chapter 7 trustee and his team of professionals from litigation in which the Trustee is attempting to recover more than $13 million being held by Shulman and related persons.

The Defendants allege that Sigmond breached the attorney-client privilege she maintained with Shulman by disclosing his secrets and confidences to the Trustee and his professionals. Therefore, they aver, the Trustee has gained an unfair litigation advantage by using privileged information. Thus, they argue, the Trustee's case is rife with "taint" and he, as well as his professionals, should be disqualified. These contacts, they allege, began once the Trustee was appointed [10] and continued past the Brieant Order.

The Trustee and his professionals deny that they violated the Brieant Order. They stated that their "contact with [Sigmond] prior to the [Brieant Order] involved information developed by Sigmond through her role as in-house corporate counsel to Manshul and as an officer of Manshul Construction Company (Bronx), Inc. None of this implicates information which may be privileged as to [Shulman]." *SGO Memo*, at 19.[11]

### A. Yann Geron, the Chapter 7 Trustee

In addressing the motion, I first consider the role of chapter 7 trustees generally. A trustee's duties are spelled out in §§ 323 and 704 of the Code. Those duties include the authority to collect, abandon and sell property of the estate, investigate the financial affairs of the debtor, examine proofs of claims and object to the allowance of any claim that is improper, initiate lawsuits for fraudulent conveyance and preferences and make a final report and file a final account of the administration of the estate with the court and with the United States Trustee. One of the most important tasks that a trustee must accomplish is to inquire into the management of the debtor to allow an independent analysis of the debtor's past and current business. *See* 6 *Collier on Bankruptcy* § 704.08 (15th ed.1998). The trustee stands in the place of the creditors and acts for them. The essence of the motion before me is to dismiss the creditors' case against the principals of the debtors for fraudulent transfers.

The cornerstone issue here is whether a defendant to a lawsuit may disqualify a plaintiff who is acting in his capacity as a chapter 7 trustee under the bankruptcy code. It goes to the very heart of the bankruptcy system. The parties suggest that I decide this issue on a "clean slate." In a sense, I do tread on virgin soil. However, I am guided by certain principles of due process. In *Lassiter v. Department of Soc. Servs. of Durham County*, Justice Potter Stewart stated:

> For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first

---

9. "Benzija Aff." refers to the September 29, 1998 affidavit of Walter Benzija submitted in opposition this motion.

10. The Defendants state that Sigmond's participation with the Trustee's began in December 1996, "eight months before the adversary proceeding was commenced in July of 1997, five months before [I] authorized Ms. Sigmond's retention, and more than two months before the

Trustee even sought authorization to retain [her]." *Allan Shulman Memo*, at 8.

11. The "Allan Shulman Memo" cited in the previous note and the "SGO Memo" refer to the memoranda of law submitted by Allan Shulman in support of the instant motion and SGO in opposition, respectively.

considering any relevant precedents and then by assessing the several interests that are at stake.

*Lassiter v. Department of Soc. Servs.,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

In addition, the Bankruptcy Court is a court of equity and, in making my determination, I must balance the equities. *See National Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

The Defendants contend that 11 U.S.C. § 324(a), and the case law interpreting it, does not control my inquiry whether to disqualify the Trustee. Rather, they argue that I should look to that section merely for guidance in fashioning a standard. Section 324(a) of the Code provides that "[t]he Court, after notice and a hearing, may remove a trustee, other than the United States Trustee, or an examiner, for cause." 11 U.S.C. § 324(a). "Cause" is not defined in the code and must be determined on an ad hoc basis. *See In re Lundborg,* 110 B.R. 106, 108 (Bankr.D.Conn.1990). "Grounds for disapproval or removal of a trustee in bankruptcy are not to be found in his formal relationships. 'We have traditionally stressed the elements of fraud and actual injury *to the debtor's interests* ....'' *In re Freeport Italian Bakery, Inc.,* 340 F.2d 50 (2d Cir.1965) (*quoting Schwartz v. Mills,* 192 F.2d 727, 729 (2d Cir.1951)) (emphasis added). *See also Lundborg,* 110 B.R. at 108.[12] The Defendants state:

> [a]lthough the issue of protecting a client's confidences primarily surfaces in disqualification motions targeted against attorneys (as it did in the underlying motion objecting to Ms. Sigmond's retention), the concerns raised by such motions are equally applicable to the Trustee. This is so because the Trustee is an Officer of the Court, and, as such, his ethical violations are an appropriate issue for this Court's consideration.

*Shulman Memo,* at 16 n. 5 (*citing In re Farmers Co-op of Ark. & Okl., Inc.,* 53 B.R. 600, 603 (Bankr.W.D.Ark.1985); *In re Russo,* 18 B.R. 257, 270 (Bankr.E.D.N.Y.1982)).

Other than dismissing the proceeding, I find no authority in case law or the Federal Rules of Civil Procedure that allows me to disqualify or remove a plaintiff. Indeed, while I may have inherent authority to dismiss a complaint for a party's intentional or egregious behavior as an extension of the authority granted to courts to punish wrongful litigant conduct during discovery, it is a drastic measure. *See, e.g., Valentine v. Museum of Modern Art,* 29 F.3d 47, 49–50 (2d Cir.1994) (finding that sustained and willful intransigence supported dismissal); *Hughes v. Atlantic Oldsmobile, Ltd.,* 202 A.D.2d 392, 608 N.Y.S.2d 522 (2d Dep't 1994) (affirming trial court's dismissal of complaint for violation of court order pursuant to N.Y. C.P.L.R. 3126 where plaintiff deliberately removed evidence and permanently prejudiced defendants); *Miller v. County of Orange,* 120 A.D.2d 713, 502 N.Y.S.2d 510 (2d Dep't 1986) (affirming trial court's dismissal of complaint for violation of court order pursuant to N.Y. C.P.L.R. 3126 where plaintiff wilfully failed to preserve evidence). I find § 324(a) unhelpful. Therefore, I look to equity to help resolve this dispute.

The threshold question is whether the Trustee, and his professionals, had any legal right to the information held by Sigmond or was all information in her possession, regardless of how she obtained it, privileged to Shulman. The Defendants argue that the Batts Decision determined that everything Sigmond knew belonged to Shulman and was privileged. The Trustee, in contrast, argues that the Batts Decision did not reverse my legal conclusion that Sigmond had a separate, or divisible, attorney-client privilege as to both Shulman and the Debtors. Thus, what belonged to the Debtors, now belongs to the Trustee. The ultimate issue of disqualification turns on resolution of this issue. If the Defendants are correct, then any communication between the Trustee or his pro-

---

**12.** I note that the Defendants' lawyers incorrectly stated the law. Each failed to note that preju- / dice under § 324(a) must inure to *the Debtors.*

fessionals with Sigmond should disqualify them from this adversary proceeding. The Trustee's counsel admits as much. At oral argument, the Trustee's counsel stated that if he could not talk to Sigmond at all

> and that has always been the rule from the [first] day of this case, then throw us out because [of] that we are guilty. That was in the time records, that's undisputed. We did talk to her in December of 1996. And we did talk to her next when deciding whether she should be retained. And we did talk to her to prepare her for her testimony in that contested hearing. And we did talk to her about the results of that hearing. All of that is true, but she was, as Your Honor found, Manshul's in-house counsel and she had observed activity of Manshul's employees, of Manshul's activities, of Manshul's affairs that is relevant to a Trustee's investigation and she had privileged communications as Manshul's attorney to whom the Trustee succeeds as the holder of that privilege.

*R.* at 178.[13]

■ The Defendants misinterpret the reach of the Batts Decision. That decision did not reverse my conclusion that Sigmond owed a separate, or divisible, attorney-client privilege to Manshul and Shulman. This single issue topples the Defendants' house of cards and dooms their motion. The Batts Decision only held that Sigmond could not be retained by the Trustee. The Trustee honored that decision. Nothing in the Batts Decision prevented Sigmond from providing the Trustee and his professionals with non-privileged information or the Debtors' privileged information that now belongs to the Trustee. There is a difference between being retained as an attorney to the trustee and providing information that either belongs to the trustee or is non-privileged. It is the duty of the trustee to investigate the financial affairs of the debtor. *See* 11 U.S.C. § 704. In essence, Shulman seeks to prevent the Trustee from pursuing almost $13 million in claims that belong to the estate and that may inure to the benefit of the creditors because he spoke with the Debtors' chief

litigator about his personal litigations. This he cannot do.

On April 16, 1997, I read into the record my decision on the Trustee's application to retain Sigmond. In that decision, I found that the attorney-client privilege was separate, or divisible, between Manshul and Shulman. In other words, certain secrets and confidences belonged to Shulman and certain others belonged to Manshul. I opined that a lawyer who represents both the debtor and its principal is:

> a problem inherent in a lot of these cases and the issue is[,] ... in what is, essentially, an alter ego situation, but not technically [so], ... does the lawyer get conflicted out? ... I don't believe that that person is conflicted out under that circumstance.

> I believe that the Trustee can retain [Sigmond]. So that its clear, nothing in this decision in any way relinquishes her of any professional responsibility she has, nor for any professional liability she may have either to Manshul or to Mr. Shulman, if she does it. Her responsibility is still not to act improperly.

> The question is, can the Trustee, under this situation, retain her. I believe the Trustee can retain her. I believe that she can be retained to do work in areas that don't overlap into the criminal matter and don't overlap into the transfer matter; matters where she certainly knew or should have known that there was an attorney-client privilege building up; and I use the word "privilege" loosely because I don't believe there is a privilege because of the multi-hat situation, but rather an obligation and I'm not going to set up a procedure to monitor that.

*April 16, 1996 Transcript,* at 66–68.

On appeal of the Retention Order, Shulman argued, "because Sigmond counseled and represented Shulman individually, the ethical and disciplinary rules prohibit her from representing the Trustee." *In re Manshul Constr. Corp.,* No. 97 Civ. 4295, 1998 WL 405039, *3 (S.D.N.Y. Jul. 20, 1998). The District Court reversed the Retention Order

---

**13.** "R" refers to the record from the oral argument held before this Court on October 21, 1998.

on two grounds.[14]  First, the Court reversed and disqualified Sigmond under the "substantial relationship" test.  The Court focused on the "substantial relationship" between the subject matter of Sigmond's prior representation and the issues in the bankruptcy action.  *See id.* at *4.  The Court identified two areas that were substantially related: (1) Sigmond's potential assistance to the estate to collect contract balances owed by the New York City Board of Education and Sigmond's representation of Shulman in the Criminal Case, where he argued in defense that "these same monies were justly due and owed to Manshul by the Board of Education pursuant to a number of contracts" and (2) certain indemnity agreement executed by both Shulman and Manshul with Aetna.[15]  *See id.*  The Court also reversed and disqualified Sigmond under Canon 9 of the Model Code of Professional Responsibility.[16]  The Court also found "that there [was] a possibility that Sigmond, in her representation of the Trustee, may improperly use confidences gained in her representation of Shulman to his detriment."  *Id.* at *6.  Ultimately, the Court ruled that the Trustee could not retain Sigmond.

The reasoning in support of disqualification in the Batts Decision did not disturb my understanding of the attorney-client privilege and how it applied in this instance.  The Trustee of a corporate debtor succeeds to, and may waive, the corporation's attorney-client privilege as to pre-petition communications.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 357, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).  Indeed, the bankruptcy trustee "plays the role most closely analogous to that of a solvent corporation's management."  *Id.* at 353, 105 S.Ct. 1986.  Here, the Trustee owned all the privileges, secrets and confidences and other non-privileged information in Sigmond's knowl-

edge that belonged to the Debtors.  The Debtors paid her substantial sums to acquire that information.

When the Debtors filed for bankruptcy protection, their business was litigation.  Sigmond, their in-house lawyer, was responsible for supervising and overseeing that litigation.  She appeared as counsel of record and worked with outside counsel.  She was the repository of a good deal of information.  Some of it, such as the court calendar status and the corresponding pending motions and depositions, were neither confidential nor privileged to anyone.  Some of it, such as Manshul's defenses to claims it failed to pay creditors and their plans to collect monies owed to them, was privileged to Manshul, but not Shulman.  I think the Defendants misread the Batts Decision to hold that nothing she learned as counsel to both Debtors and President of Manshul (Bronx) may be disclosed to the Trustee.  There is a difference between being the Trustee's attorney, with all of the confidential duties and obligations inherent in that relationship, and giving the Trustee information belonging to Manshul, to which Shulman does not have a reasonable claim of privilege.

The Defendants contend that the January Memo, standing alone, proves prejudice to the Defendants and a concerted effort to circumvent the Brieant Order.  The Defendants also claim that the January Memo unfairly and unethically provides the Trustee and his professionals, with Sigmond's insight and strategy.  My reading of the January Memo does not support that conclusion.

In their briefs, Defendants argued that "[b]y acting as a conduit for information from Ms. Sigmond to the Trustee while acknowledging the 'sticky problem' that he and Trustee's counsel were facing, Mr. Brickman

**14.** I am bound by the Batts Decision, but on reflection, I am now convinced that it is correct.

**15.** Specifically, the Court cited three indemnity actions Aetna initiated against Shulman: (1) *Aetna Casualty & Surety Co. v. Manshul, Ascot, Shulman & Patricia Shulman*, No. 95 Civ. 3994 (S.D.N.Y.) (McKenna, J.); *Yonkers Board of Ed. v. Aetna Casualty & Surety Co./Aetna Casualty & Surety Co. v. Manshul, Ascot & Shulman*, No. 12491/95T (Sup.Ct. Westchester County 1995);

and (3) *Aetna Casualty & Surety Co. v. Ascot Maintenance Corp. & Shulman*, No. 604142/96 (Sup.Ct. N.Y. County 1996) (Gammerman, J.).

**16.** Canon 9 of the Model Code of Professional Responsibility provides, "A lawyer should avoid even the appearance of professional impropriety."  *Model Code of Professional Responsibility* Canon 9 (1983).

was confirming that he and the Trustee knew full well that the Trustee was not entitled to the information conveyed by Ms. Sigmond." *Shulman Memo*, at 14; *accord Nancy Shulman Memo*, at 18–19.[17]

Brickman stated that the information he gave to SGO in the January Memo "related to the names of several of Manshul's employees who could possibly provide the Trustee information relating to the various construction jobs undertaken by Manshul." *Brickman Aff.* ¶ 5.[18] At oral argument, Brickman responded to the Defendants' interpretation of the January Memo as follows:

> If you look at the second sentence, "Ms. Carol Sigmond informed me that the following individuals all former Manshul employees would be the most knowledgeable deponents regarding the status of Manshul's construction projects," a Manshul-type thing, and how the company, Manshul, dealt with its subcontractor payables, a Manshul-type thing.
>
> I didn't ask her a question related to any indemnity issue. I didn't ask her a question related to the shifting of money. What I asked her is who would be the most knowledgeable person or people on two Manshul-type issues, status of construction projects [and] ... how does Manshul deal with its subcontractor payables.... [T]he next issue ... was the ["]sticky problem["].

\* \* \*

> Ms. Sigmond addressed three concerns the [January Memo] said.... What is the sticky problem? That she wants to be paid. You cannot do that without retaining her. That she's unwilling to submit to [Mr. Brecker's] cross-examination.... And I write, "I have no recommendation to this." Because he's going to take her deposition and you can't pay her and she may suddenly become unavailable and she was the in-house counsel of Manshul and the

president of Manshul Bronx who knows about issues, Manshul-type issues that you need information [about]. *R.* at 156–60.

The Trustee argues that the Defendants failed to demonstrate, other than through speculation, how the information in the January Memo, which was available in the Debtors' books and records, was privileged. Moreover, he claims, he always intended to subpoena the individuals in the January Memo.

It appears that the Defendants' position is that Sigmond may not communicate with the Trustee or his team of professionals about anything, privileged or not, confidential or public, without raising the strongest negative presumption against the Trustee. They cite no direct law to support their contention and I found none. The foundation for Defendants' position is that once Sigmond represented Shulman for anything, everything she did for Manshul, either as a lawyer or an officer, fell under the cloak of Shulman's attorney-client privilege. That assumption is simply wrong. Therefore, as any structure built upon a weak foundation, the argument must fall.

The Defendants have not produced any evidence that the Trustee is in possession of privileged information or secrets and confidences of Shulman. At best they offer the January Memo as a "smoking gun." The gun, however, is firing blanks. Brickman provided a plausible explanation of his memo. While I can see how the Defendants may have raised an eyebrow to some it, it was adequately explained. The Defendants have presented no evidence. Their attempt to create a presumption that Sigmond gave the Trustee Shulman's protected confidences is unsupported in law and fact. I cannot disqualify the Trustee, and the entire creditor body, as a plaintiff in this adversary proceeding based on scant evidence, speculation and innuendo.[19]

**17.** The "Nancy Shulman Memo" refers to the memorandum of law submitted by Ms. Shulman in support of the instant motion.

**18.** "Brickman Aff." refers to the September 28, 1998 affidavit of Neil Brickman submitted in opposition this motion.

**19.** As further evidence of taint, Defendants also assert that the Trustee possessed a privileged memorandum prepared by Sigmond which contained litigation summaries, "tigger dates," and projected outcomes of the over 130 pending lawsuits (the "Case Summary"). *See Motion*, Exhibit K. It appears that the Litigation Summaries

Accordingly, the Defendants' motion to disqualify the Trustee is denied.

## B. Salomon Green & Ostrow

Before I reach the issue of whether SGO should be disqualified as counsel to the Trustee, I pause to restate the Second Circuit's observations in another ethics decision. They are appropriate here.

> We hasten to add that the lawyers involved in this dispute are individuals who enjoy the high regard of the profession. Compliance or noncompliance with Canons of Ethics frequently do not involve morality or venality, but differences of opinions among honest men over the ethical propriety of conduct.

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 226 (2d Cir.1977).

■ Here, the Defendants call upon me to "preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 564–65 (2d Cir. 1973). Motions to disqualify counsel turn on the application of either the "per se" rule or "substantial relationship" test. An attorney is disqualified under the "per se" rule for concurrently representing clients with adverse interests.

■ The "substantial relationship" test consists of the following elements. First, the former attorney had to have access to his former clients' confidential and secret information. Second, the information must be directly and substantially related to the subject matter of the dispute in issue. Third, the former attorney must be involved in the prosecution of the current case as either an interested party, counsel or assistant counsel for the plaintiffs. *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *Ackerman v. National Property Analysts, Inc.*, 887 F.Supp. 510, 515 (S.D.N.Y. 1993); *In re Manshul Constr. Corp.*, No. 97

Civ. 4295, 1998 WL 405039, *4 (S.D.N.Y. Jul. 20 1998). If there is a substantial relationship between two representations, there is a presumption that the former client imparted confidential information to his attorney. *See United States Football League v. National Football League*, 605 F.Supp. 1448, 1461 (S.D.N.Y.1985).

■ A party seeking disqualification of counsel must meet a high standard of proof. *See Paramount Communications, Inc. v. Donaghy*, 858 F.Supp. 391, 394 (S.D.N.Y.1994). Mere speculation will not suffice. *Id.* I note the New York Court of Appeals' most recent articulation on the issue.

> While a movant need not actually spell out the claimed secrets and confidences in order to prevail, it must at a minimum provide the motion court with information sufficient to determine whether there exists a reasonable probability that DR 5–108(a)(2) would be violated. Here, defendant's generalized allegations, even placed side-by-side with [the plaintiff's attorney's] disclosure of generally known information, are insufficient to justify disqualification.

*Jamaica Public Serv. Co., Ltd. v. AIU Ins. Co.*, 92 N.Y.2d 631, ——, —— N.Y.S.2d ——, —— N.E.2d ——, 1998 WL 885062, at *3 (1998).

■ The Defendants' motion to disqualify the Trustee's counsel is denied. SGO is not concurrently representing clients with adverse interests, thus the only applicable test is "substantial relationship." SGO was never a counsel to Shulman nor is it an interested party here. Thus, SGO cannot be disqualified pursuant to the "substantial relationship" test either. As a result, Defendants' contention that it is presumed that confidential information was imparted between Sigmond and SGO falls to the side. Accordingly, Defendants have not proven any grounds warranting SGO's disqualification as the Trustee's general counsel.

---

were produced to the Trustee in connection with a subpoena of the Debtors' Chapter 11 accountants. It also appears that the subpoena was the subject of a motion to quash made by the Defendants. I denied the motion and the Defendants appealed. Their appeal was ultimately dismissed for a lack of prosecution. Accordingly, nothing in the Litigation Summaries can be considered privileged.

Moreover, I note that courts are concerned with the use of disqualification motions, which result in drastic measures, as a trial tactic. *See Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir.1977); *Jamaica Public Serv. Co.,* 92 N.Y.2d 631, ——, —— N.Y.S.2d ——, —— N.E.2d ——, 1998 WL 885062, at \*3 (1998) ("As we have previously recognized, disqualification motions present competing concerns. Balanced against the vital interest in avoiding even the appearance of impropriety is concern for a party's right to representation by counsel of choice and danger that such motions can become tactical 'derailment' weapons for strategic advantage in litigation.") (citations omitted). The Defendants' made their motion long after the information was available to them and after I certified it trial ready.

The Defendants' motion to disqualify the Trustee's counsel is denied.

## C. BDO Seidman

██ William K. Lenhart ("Lenhart"), a BDO partner, refutes the Defendants' allegation that (1)"BDO changed its expert report on the basis that the memorandum dated July 15, 1996 (the "Memorandum") prepared by [Sigmond], was [Sigmond's] work product protected from discovery by [Shulman's] attorney-client privilege" and (2) BDO relied on an allegedly privileged case summary (the "Case Summary"), prepared by Sigmond, which detailed over 130 litigations pending against the Debtors. *See Lenhart Aff.* ¶¶ 2 & 8.[20] First, Lenhart argues that the Memorandum was received from the Debtors' chapter 11 accountants and was the subject of a motion to quash. *Id.* ¶¶ 3–4. I denied that motion and the Debtors appealed. During the pendency of the appeal, Lenhart was advised by SGO not to rely upon the Memorandum, in the event my decision denying the motion to quash was reversed. *Id.* ¶ 6. The appeal was dismissed for a failure to prosecute. *Id.* Thus, Lenhart avers, he changed his report, not because he relied on privileged material, but because of his con-

cern that the Memorandum may have been ultimately ruled inadmissible. *Id.* ¶ 7.

Second, Lenhart asserts that the Case Summary was not illegally used because (1) it too was received from the Debtors' chapter 11 accountants and (2) it was prepared for Manshul and, thus, not subject to Shulman's attorney-client privilege.

I have found that the Trustee is in possession of information that he legally owned and was not privileged to Shulman. I have also found that the Trustee's counsel is not disqualified because there is neither a per se conflict nor a substantial relationship warranting their disqualification. Accordingly, I presume that the information BDO received to conduct its analysis flowed from these two entities. If the information they used was not tainted, then there is no grounds to remove the Trustee's accountant either.

The Defendants' motion to disqualify the Trustee's accountants is denied.

## D. Other Relief

For the foregoing reasons, I conclude that the Trustee and his professionals should not be disqualified. Accordingly, there is no basis for me to award the other forms of relief sought by the Defendants.

The Defendants' motion to: (1) to dismiss the amended complaint without prejudice; (2) grant a broad protective order to prevent the further utilization of privileged materials that were wrongfully solicited from Sigmond; and (3) grant discovery concerning the Trustee's apparent violation of the Brieant Order, is denied. However, I do not reach the issue of whether the Brieant Order was violated.[21] To the extent the Defendants' believe the Brieant Order was violated, they may make the appropriate motion to the appropriate court. *See Gray v. Petoseed Co., Inc.,* 985 F.Supp. 625 (D.S.C.1996) ("Only the court offended has the power to punish for the contempt or to entertain proceedings to that end") (internal citations and quotations omit-

---

**20.** "Lenhart Aff." refers to the September 28, 1998 affidavit of William K. Lenhart submitted in opposition this motion.

**21.** In addition, I do not reach the question of whether the Defendants have causes of action against either Sigmond or Brickman for their alleged misconduct. These issues are not before me.

ted), *aff'd,* 129 F.3d 1259 (4th Cir.1997); *Equal Employment Opportunity Comm'n v. Local 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,* 885 F.Supp. 488, 490 (S.D.N.Y.1994) (*citing Ex Parte Bradley,* 74 U.S. (7 Wall.) 364, 372, 19 L.Ed. 214 (1868)), *rev'd on other grounds,* 76 F.3d 76 (2d Cir.1996).

## CONCLUSION

For the reasons set forth above, the Defendants' motion is denied in all respects. Settle Order.